UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LONDEL STEELE,                                          :

                      Petitioner,              :        06 Civ. 1406  (GWG)

       -v.-                                     :        **OPINION AND ORDER**

BRIAN FISCHER,                                  :

                      Respondent.          :
-----------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Londel Steele brings this <u>pro se</u> petition for writ of habeas corpus challenging his

conviction in the Supreme Court of the State of New York, New York County, for two counts of

Rape in the First Degree (New York Penal Law ("N.Y.P.L.") § 130.35(1)), one count of Sexual

Abuse in the First Degree (N.Y.P.L. § 130.65(1)), one count of Rape in the Third Degree

(N.Y.P.L. § 130.25(2)), and one count of Criminal Possession of a Weapon in the Third Degree

(N.Y.P.L. § 265.02(1)).  Steele was sentenced to concurrent terms of imprisonment for these

convictions, the longest of which was 25 years to life on the first-degree rape charge.  Steele is

currently incarcerated at Sing Sing Correctional Facility in Ossining, New York.  The parties

have consented to disposition of this matter by a United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).   For the reasons stated below, Steele's petition is denied.

# I. BACKGROUND

## A. Evidence Adduced at Trial

### 1. The People's Case

Steele and T.C.[1] met in early 1998 and began dating in August of that year, when she was sixteen and he was twenty-four. They each lived with their families in different apartments at 40 West 115th Street. See T.C.: T. 4-10.[2] During their approximately two-month-long relationship Steele would "[s]ometimes . . . act regular and then sometimes he just had a bad temper." (T.C.: T. 9-10). Steele and T.C. had sexual intercourse approximately five to seven times over the course of the relationship. (T.C.: T. 17). In mid-October 1998, T.C. told Steele that she wanted to end the relationship, to which Steele responded by "arguing with me, yelling at me." (T.C.: T. 11). By then, she was getting "more and more scared" of him because he was being "over-protective" and would wait for her outside her window or her school. (T.C.: T. 25). She also testified that he had been "throwing things" and threatening that, if she left him and dated other men, he would shoot them. (T.C.: T. 20-21).

On November 9, 1998, at about 2:00 p.m., Steele called out to T.C. from the window of his apartment as she was returning home from school. (T.C.: T. 22). When T.C. got to her front door, she found Steele there, asking why T.C. had not called him. (T.C.: T. 24). Steele told T.C. that he wanted her to return tapes and CD's belonging to him and she agreed to do so. (T.C.: T.

---

[1]In accordance with N.Y. Civil Rights Law § 50-b, and pursuant to the order of this Court dated April 20, 2006, the Court will refer to the victim of the rape by her initials.

[2]"V." refers to the transcript of the voir dire held November 22 and 23, 1999. "T." refers to the transcript of the trial held November 29 and December 7 and 8, 1999. "S." refers to the transcript of the sentencing held February 24, 2000. The transcripts are being filed under seal.

24).  When she got to her apartment, the phone rang and Steele was on the telephone, yelling at T.C. to bring him his belongings.  (T.C.: T. 26-27).

T.C. then went to Steele's apartment to return the items. (T.C.: T. 26-27).  Steele opened the door and they argued at the doorway.  (T.C.: T. 29).  T.C. testified that Steele "said sit in like by the door, so I went to sit by the door and it was like he like pulled my arm."  (T.C.: T. 29).  Steele then locked the door behind her.  (T.C.: T. 30).  At this point T.C. "started getting scared" and told Steele that she needed to go back upstairs to help her mother pick up her niece from school.  Steele asked her why she had told her mother where she was going.  (T.C.: T. 30).  When T.C. attempted to unlock the door, Steele told her "don't touch the door" and "don't test him."  (T.C.: T. 31).  Steele then went into another room and returned with a knife, about "14 or 15 inches long."  (T.C.: T. 31-32).

As they continued to argue, Steele told her "to shut up and go to the back," where his bedroom was, and T.C. started to cry.  (T.C.: T. 33).  T.C. walked into Steele's bedroom, believing that if she "just let him talk," he would let her leave.  (T.C.: T. 34).  Once in the bedroom, Steele told her that if she stopped crying he would put the knife down.  T.C. stopped crying, and Steele put the knife down on the kitchen table.  (T.C.: T. 35).  When he returned to the bedroom, T.C. told him again that she needed to leave, and Steele went back into the kitchen and got the knife.  (T.C.: T. 36).  This time, he "was holding it in his hand and asking me where should he stab me at."  (T.C.: T. 37).  T.C. replied that he should not stab her at all, and started to cry again.  (T.C.: T. 37).  Steele then stated that there were two ways T.C. could leave the apartment: either he could stab her in the face and stomach, or she could have sex with him.  (T.C.: T. 37-38).  T.C. "kept telling him I didn't want to do anything with him," and made up "a

lot of excuses why I didn't want to," such as that she was pregnant, which was not true. (T.C.: T. 38-39).

Steele then removed his coat and hat and placed the knife on the floor next to his foot. (T.C.: T. 39). T.C. was standing by the bedroom window crying, when Steele approached her and "started rubbing on" her. (T.C.: T. 40-41). T.C. continued crying, and was "moving, like trying to pull away. . . . Like pushing him off a little." (T.C.: T. 41). Steele then unbuttoned her pants and removed his own pants, and sat T.C. down on the couch in the bedroom. (T.C.: T. 42-43). After she was lying on the couch, Steele pulled her pants and underpants down to around her ankles, then he climbed in between her legs and put his penis into her vagina. (T.C.: T. 44-46). T.C. "was just crying, sitting there crying, covering my face crying." (T.C.: T. 46). Steele told her "if I move my bottom, the faster this could be over and the faster I could leave." (T.C.: T. 46). After approximately five to seven minutes, Steele withdrew his penis, at which point T.C. got up off the couch, pulled up her pants, and hurried out of the apartment as Steele was "throwing on his clothes" and telling her to wait for him. (T.C.: T. 47-49). T.C. left the building and walked toward a store across the street, hoping to find someone she knew. (T.C.: T. 51). Steele followed her out of the building. (T.C.: T. 51). T.C. ran into her aunt in the street and stopped to talk to her while Steele continued into the store. (T.C.: T. 51-52). T.C.'s mother then came outside and she and T.C. went to pick up T.C.'s niece from school. (T.C.: T. 54). During the walk, T.C. told her mother what had happened. When they returned home, her mother told her father, who called the police. (T.C.: T. 57).

The police arrived along with an ambulance, which transported T.C. to the hospital, where she was examined by a physician who was a trained sexual assault forensic examiner.

(Marrast: T. 188-90). Subsequent blood tests demonstrated that Steele's DNA matched the DNA in the semen taken from T.C.'s vagina. (Sandomir: T. 333; Langley: T. 404-17). On the evening of November 9, a police detective went to Steele's grandmother's apartment to collect evidence. In Steele's bedroom he found several hairpins on the floor and a kitchen knife on top of a storage bin inside the closet. (Aponte: T. 265-66). T.C. identified the knife as the same knife that Steele had used to threaten her. (T.C.: T. 77-78). She also testified that the hairpins were identical to the type of pins she was wearing in her hair when she went to the defendant's apartment on the day of the rape. (T.C.: T. 78-79).

Jennifer Marrast, a physician at St. Luke's Roosevelt Hospital, examined T.C. on November 9, 1998; specifically, she performed a "complete physical, the outside of the body and inside of [T.C.'s] vaginal area." (Marrast: T. 186, 218). Dr. Marrast did not find injuries, bruises, or lacerations anywhere on T.C. (Marrast: T. 222). Dr. Marrast testified that the lack of physical injury was consistent with both consensual sex and forcible sex. (Marrast: T. 228, 232).

T.C.'s mother, Deborah, testified that she knew her daughter was dating Steele and that she had told her to stop. (Deborah: T. 152, 162). On the day of the incident, she knew Steele had asked T.C. to return his belongings to him because "I was standing in her room when he yelled so loud you could hear it over the phone." (Deborah: T. 155). Deborah testified that she knew T.C. "always went downstairs" to see Steele, see Deborah: T. 156. After T.C. went downstairs to return Steele's belongings, Deborah testified that she saw T.C. exit the building, and that when she herself went downstairs to walk with T.C. to pick up her granddaughter, T.C. "seemed shaken up, was trying to hold her tears in because she was in the street." (Deborah: T. 157-59). Deborah then asked T.C. what was wrong, and after T.C. told her to "swear that I

wouldn't do anything," she told her that "Londel pulled a knife to her and forced her to have sex." (Deborah: T. 160). After they returned home, Deborah told T.C.'s father, who called the police. (Deborah: T. 161).

## 2. Steele's Case

In Steele's defense, Amy Reynolds, a law student who worked as an investigator for the Legal Aid Society, testified that on June 21, 1999, she spoke with T.C. in her apartment, in the presence of T.C.'s mother. T.C. told Reynolds what had happened, and Reynolds wrote it down and then asked T.C. to check it and make sure it was correct. T.C. said it was, but refused to sign it because her mother had told her not to. (Reynolds: T. 429, 434-41).

Reynolds testified that T.C. did not tell her that Steele had removed her clothing, but rather that, "He told me to take my clothes off. He was taking his off. I did." (Reynolds: T. 441). Reynolds also testified that T.C. did not tell her that Steele had pulled her into the apartment or that she had tried to use the door after entering the apartment, although Reynolds did not specifically ask T.C. whether she had tried to use the door. Reynolds did not ask T.C. about any threats Steele made and T.C. did not mention any such threats. (Reynolds: T. 441-42, 461).

## B. Summations

### 1. Defense Summation

In his summation, Steele's counsel, Christopher Pisciotta, challenged T.C.'s credibility as a witness. He emphasized the lack of corroborating evidence in support of T.C.'s testimony, and argued that she was not being truthful. For example, he argued,

> Do you believe [T.C.] beyond a reasonable doubt, despite what she says doesn't
> quite make sense and there's some little things that just doesn't make common

> sense?  Do you believe [T.C.] beyond a reasonable doubt when what she says is different today than what she said on prior days?  And do you believe [T.C.] beyond a reasonable doubt when she lies to you, when she lies to hide the motive as to why she would accuse this man of doing something that he did not do?

(T. 492-93).  Pisciotta pointed out that T.C. lied to her parents regarding how much time she was spending with Steele and regarding the extent of their sexual relationship, see T. 496-98, that she gave inconsistent testimony regarding whether she thought she was pregnant on November 9, 1998, see T. 500-02, and that her behavior immediately before that date suggested that she did not want the relationship to end, as she testified, see T. 504-06.  See, e.g., T. 500 ("Now, ladies and gentlemen, you know, a lot of juries outside TV and the movies don't get to see this, but you saw it.  You got to see a witness blatantly lie under oath in a court of law.").

Pisciotta then theorized that T.C. thought she was pregnant before November 9 and told her mother that Steele had raped her so that she would have an explanation for the pregnancy.  See T. 507.  He also reminded the jury of the testimony of the doctor who examined T.C., in which the doctor acknowledged that T.C. had no physical injuries and that this was "consistent with consen[s]ual sex."  See T. 513.

Finally, Pisciotta focused on the differences in T.C.'s story as she told it over time and to different people, see T. 515-23, and said,

> Ladies and Gentlemen, if she says one thing on one day and says another thing on another day, how are you supposed to believe her beyond a reasonable doubt when she says he raped me.  You can't.  You can't put faith in her words.  The truth doesn't change, but her story did.

(T. 523).

2. People's Summation

In the People's summation, Assistant District Attorney Donald Leo argued that T.C.'s story was in fact corroborated by the discovery of a knife and hairpins in Steele's bedroom and the testimony of T.C.'s mother. See T. 542-53. Leo then made the following statement:

> You know, ladies and gentlemen, we're about three weeks away from a new millennium. We're approaching the 21st century and still here today, we're still dealing with the lying women defense. That's ridiculous. This argument that the defense suggests to you, what it does is it promotes forgetting. That's what it does.

(T. 561). The court sustained Steele's counsel's objection to this statement, but declined to give a curative instruction to the jury at that time. (T. 561-62). Leo then continued to explain the inconsistencies in T.C.'s multiple recountings of what happened:

> After you've been raped, after a two- to three-hour grueling physical examination where you're stripped naked, where you've got your vagina stretched and a stranger has poked all these objects in your vagina, you better tell your story . . . to another stranger in exact detail, in every detail, because if you don't we're not going to believe you. . . . And if you have the nerve to tell your loved ones about this sexual attack and they don't tell the story in exactly the same detail as you do, well, you know what, ladies and gentlemen? We're not going to believe you, and from every moment hereafter, every time you tell your version of the facts, whether it's to a police detective, a grand jury or to a trial, you better tell it in exactly the same detail because if you don't, we're not going to believe you. How ridiculous does that sound, ladies and gentlemen?

(T. 562-63). Steele's counsel objected again, and the court again sustained the objection, and then issued the following curative instruction to the jury:

> [I]t's an important part of your job to decide whether and to what extent you credit the testimony of [T.C.]. In any case, including this one, if a person on a prior occasion has said something that's inconsistent, then you use that in figuring out whether or not you're going to believe what the person said or whether or not the person's exaggerating or not exaggerating, whether the person's mistaken or not mistaken, whether the person is lying or not lying. You use that in deciding whether you're going to believe and how much you're going to credit in a person's testimony, and that's the only way that you use it in this case.

I'm going to ask you to disregard the argument that Mr. Leo has just made now; that is, somehow or other implicit in there is that if you disbelieve this witness it will have some consequence on some other trial or some other case or the way other people report cases, and that absolutely has nothing to do with the question in front of you. The question in front of you is, do you credit what [T.C.] said? That's the question, and you can't make that decision based upon some other hypothetical future other case of how people are going to act, people in other cases. It has nothing to do with this case, so I'm going to ask you to disregard that.

(T. 563-65).

Later in his summation, Leo argued that T.C.'s testimony was believable and consistent, and that "[t]he fact that the defendant Londel Steele forcibly engaged in sexual intercourse with [T.C.] is uncontradicted." (T. 586). Steele's counsel objected to this statement, and the court overruled the objection. (T. 586). Leo then continued,

The defendant doesn't have a burden in this case. I have the burden, but in his argument he attempted to contradict the testimony of [T.C.]. Her testimony is uncontradicted. We've proven that there was forcible compulsion in this case. The main issue.

(T. 586).

At the close of the People's summation, Steele's counsel moved for a mistrial based on the objections he had raised during the summation. The court denied the motion. (T. 591-92).

C. Jury Charge, Verdict, and Sentencing

In his charge to the jury, the trial judge made the following reference to the objections raised during the People's summation:

Now, in particular, when I say decide the case without fear, favor or sympathy, I need to refer back to two arguments that were made during summation. At one point during the flow of summation, an argument was made that – to consider other future incidents or impact in the millennium. Obviously, you don't do that. Your job here is to decide the case based on what the witnesses said in a cold, rational, logical way and decide based on that was the case proven beyond a reasonable doubt. Don't start guessing or speculating or wondering about

something that's irrelevant and has nothing to do with this case and some other future case. It has nothing to do with this case.

Also, in addition, I think at one point an argument was made to put yourself in the shoes of somebody, [T.C.] or someone else or some future person. When we say decide a case without sympathy, we're telling you specifically don't do that.

Everybody who comes into this courtroom has feelings. Every witness you heard has feelings, the defendant, the defendant's family, [T.C.], [T.C.]'s family, other people, they all have feelings and opinions. If we wanted them to be the jury we'd let them be the jury. They're not the jury. The reason you're the jury is because instead of deciding this case based on their feelings and emotions and sympathy, you as – in a cold, hard, rational, logical way look at the facts without sympathy, without feelings for one side or the other, but just say to me – don't tell me who you care about or don't care about, but tell me what was proven, what wasn't. Let's use common sense that way. That's why you're the jury, not the witnesses. So I'm going to ask you to please reject both of those arguments when I tell you that you should decide this case without fear, favor or sympathy.

(T. 600-02). Later in the charge, the trial judge addressed the issue of witness credibility and

prior inconsistent statements:

I think there was an argument about . . . whether or not a person has to say – give a story perfectly the same on every occasion as a requirement for you to believe or not believe a witness. I don't think that either side is making that argument to you, and so, for instance, when Mr. Pisciotta asked you to look at prior statements of [T.C.] and thereby to decide whether or not you're going to credit her testimony, that was a perfectly proper approach and . . . it's for you to look at prior statements and decide if there are inconsistencies, are they minor or small and they don't mean anything to you, then go ahead and credit her testimony, if you want to, based upon all the other tests I've talked about. On the other hand, if there are inconsistencies and you think they're the kind of inconsistencies that affect the way you view her testimony here, then that's your job. It's perfectly proper for you and you should in this case, not in some other hypothetical case somewhere else, but in this case, decide whether you credit her and how much based upon what you perceive to be inconsistencies that matter to you, but . . . don't take any prior statement that was said outside a court as evidence of whether something happened or didn't happen.

(T. 621-22).

Following the charge, the jury retired to deliberate the case. In the evening, the jury

requested readbacks of T.C.'s testimony and of the instructions regarding reasonable doubt. (T. 655-59). The following morning, the jury sent a note out to say they had been deadlocked eleven to one since the previous evening. (T. 666). The judge instructed them to continue deliberating. In the afternoon, the jury sent out another note saying they remained deadlocked and that they "know for certainty that we will not reach a unanimous vote. People are getting intemperate." (T. 673). Again, the judge instructed them to continue deliberating. After a total of nine or ten hours of deliberation, the jury returned a verdict of guilty on all counts. (T. 684-87).

On February 24, 2000, the court sentenced Steele to concurrent terms of imprisonment of 25 years to life on the first-degree rape charge and 12 years to life on the sexual abuse charge. The court also sentenced him, as a second felony offender, to concurrent terms of two to four years' imprisonment on both the third-degree rape and weapons possession charges, to run concurrently with the sentences for the rape and sexual abuse convictions. (S. 19).

D. Direct Appeal

Steele originally raised two claims on appeal: (1) that it was reversible error for the trial court not to discharge a prospective juror for cause where that juror had affirmed that he would have difficulty not drawing an adverse inference if Steele did not testify; and (2) that the prosecutor's remarks during summation were so improper as to deny Steele due process under the Fourteenth Amendment. See Brief for Defendant-Appellant, dated Dec. 2003 (reproduced as Ex. A to Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed Apr. 26, 2006 (Docket #8) ("Maerov Decl.")) ("Def. App. Br."). Steele subsequently dropped the first claim, and on November 30, 2004, the Appellate Division, First Department, rejected Steele's

remaining claim and affirmed his conviction.  See People v. Steele, 12 A.D.3d 323, 323 (1st

Dep't 2004).

>The court held that the prosecutor's comments at summation
>
>were a fair response to defendant's attack on the complainant's motives and
>credibility (see People v. Chavez, 207 A.D.2d 705, 706 [1st Dep't], lv. denied, 84
>N.Y.2d 934 [1994]).  In any event, the curative instructions given by the trial
>court both during the prosecutor's summation and in its charge to the jury
>effectively eliminated any possible prejudice to defendant (see People v. Cantel,
>211 A.D.2d 536, 536 [1st Dep't], lv. denied, 85 N.Y.2d 970 [1995]).

Steele, 12 A.D.3d at 323.  On January 28, 2005, the New York Court of Appeals denied Steele

leave to appeal.  See People v. Steele, 4 N.Y.3d 768 (2005).

### E.  The Instant Petition

Steele timely filed a petition for habeas corpus on February 22, 2006.  See Petition for a

Writ of Habeas Corpus by a Person in State Custody, filed Feb. 22, 2006 (Docket #1)

("Petition").  In his petition Steele restates his second claim from his appellate brief: that the

prosecutor's comments at summation deprived him of the due process of law.  See Petition at 6-

12.[3]  On April 26, 2006, Respondent filed papers in opposition.  See Maerov Decl.; Respondent's

Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Apr. 26, 2006

(Docket #7) ("Resp. Mem.").

## II.  STANDARD OF REVIEW

A petition for a writ of habeas corpus may not be granted with respect to any claim that

has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1)

---

[3]Because Steele is a pro se plaintiff, the Court construes his petition liberally, see, e.g.,
Williams v. Kullman, 722 F.2d 1048, 1050-51 (2d Cir. 1983), and assumes that he incorporates
all arguments that he made in his appellate brief with respect to this claim.  See Def. App. Br. at
38-54.

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims . . . with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (internal quotation marks and citations omitted).  As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited.  See Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) (internal quotation marks omitted); accord Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.").

In Williams v. Taylor, the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result.  529 U.S. 362, 405-06 (2000).  Williams also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies

that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). To be entitled to habeas relief, a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. See, e.g., id. at 68.

## III.  DISCUSSION

### A.  Applicable Law on Habeas Corpus Review of Prosecutorial Misconduct Claims

When a federal habeas court reviews comments made by the prosecutor during trial, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The scope of review for allegations of prosecutorial misconduct in the habeas context is "quite limited." Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). Relief is available only where the court "find[s] that the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights." Id. (citing Donnelly, 416 U.S. at 647-48); see also Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas

corpus is the narrow one of due process, and not the broad exercise of supervisory power.")
(internal quotation marks and citations omitted).

Because the consideration of a prosecutor's summation requires an inquiry only into
whether the defendant was denied a fair trial, it is irrelevant whether the prosecution's comments
were "undesirable" or even "universally condemned." Darden, 477 U.S. at 181 (citation
omitted). Moreover, the effect of the prosecutor's misconduct on the trial, not the prosecutor's
state of mind, is central to the due process inquiry. See generally Smith v. Phillips, 455 U.S.
209, 220 (1982). Finally, in evaluating whether comments during summation deprived the
defendant of a fair trial, it is important to place the "remarks in context." See Darden, 477 U.S.
at 179; accord Greer v. Miller, 483 U.S. 756, 766 (1987); United States v. Young, 470 U.S. 1,
11-12 (1985); Blissett v. Lefevre, 924 F.2d 434, 440 (2d Cir.), cert. denied, 502 U.S. 852 (1991).
In other words, "the law is settled that federal habeas relief is not available on the basis of
improper prosecutorial statements at trial unless the errors, in context of the summation as a
whole, were so fundamentally unfair as to deny petitioner a fair trial." Tejada v. Senkowski,
1993 WL 213036, at *3 (S.D.N.Y. June 16, 1993) (citations and internal quotation marks
omitted), aff'd mem., 23 F.3d 397 (2d Cir.), cert. denied, 513 U.S. 887 (1994).

Even where a petitioner has shown prosecutorial misconduct with respect to comments
made during summation, he must still show "that he suffered actual prejudice because the . . .
comments . . . had a substantial and injurious effect or influence in determining the jury's
verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994), cert. denied, 516 U.S. 1152 (1996);
accord Tankleff, 135 F.3d at 252; Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991). Three
factors are considered when determining whether actual and substantial prejudice occurred: (1)

the severity of the misconduct, (2) the nature of curative measures taken to remedy the prejudice, if any, and (3) the certainty of the conviction absent the improper conduct. See Bentley, 41 F.3d at 824; Floyd, 907 F.2d at 355; Gonzalez, 934 F.2d at 424.

B. The Prosecutor's Statements

We now review the prosecutor's challenged statements with these principles in mind.

1. The "Lying Woman" Defense

Steele contends that the prosecutor improperly prejudiced the jury when he stated that in the "new millennium," it would be "ridiculous" to rely on "the lying women defense," which "promotes forgetting." See Petition at 10-11; Def. App. Br. at 40-43; T. 561. Steele argues that such language "impl[ies] that the very strategy and focus of the defense, the very act of suggesting that complainant's credibility was suspect, was normatively bankrupt and politically incorrect." See Petition at 11; see also Def. App. Br. at 42 (the prosecutor's language "associated the complainant with a class of people whose allegations had historically been ignored and for whom justice was elusive. . . . Here . . . the prosecutor attempted to make the jury feel guilty if it doubted the complainant's testimony, as to do so would to be ignoring her claims as society ignored women in the past."). Furthermore, Steele argues, by claiming that such a defense "promotes forgetting," the prosecutor was "insist[ing] that the jury step outside the immediate context of the trial and consider the broad, negative policy implications of the defense's strategy for other complainants." See Def. App. Br. at 43.

While the prosecutor's suggestion was not consistent with the jury's proper function, the court's curative instruction directed towards this comment clearly and forcefully told the jury that it should disregard consideration of whether its disbelief of T.C. would "have some

consequence on some other trial or some other case or the way other people report cases." (T. 564). The Court stated that this question "absolutely has nothing to do with the question in front of you." (T. 564). It added that "[t]he question in front of you is, do you credit what [T.C.] said? That's the question, and you can't make that decision based upon some other hypothetical future other case of how people are going to act, people in other cases. It has nothing to do with this case." (T. 564-65). During the jury charge, the court reiterated this principle:

> At one point during the flow of summation, an argument was made that – to consider other future incidents or impact in the millennium. Obviously, you don't do that. Your job here is to decide the case based on what the witnesses said in a cold, rational, logical way and decide based on that was the case proven beyond a reasonable doubt. Don't start guessing or speculating or wondering about something that's irrelevant and has nothing to do with this case and some other future case. It has nothing to do with this case.

(T. 600-01).

The trial court was thus clear in reminding the jury of its obligation to focus only on the facts of the case before it. A jury is presumed to follow such limiting instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)); accord Greer v. Miller, 483 U.S. 756, 767 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . , unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions."); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 367 (1963) (when a limiting instruction is clear, "[i]t must be presumed that the jury conscientiously observed it"); see also United States v. Snype, 441 F.3d 119, 129-30 (2d Cir. 2006) ("As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions.") (citing Zafiro v. United States, 506 U.S. 534, 540-41 (1993)). This presumption "can 'evaporate[ ] where there is an

overwhelming probability that the jury will be unable to follow' a limiting instruction that demands 'mental acrobatics' of the jurors." See Snype, 441 F.3d at 130 (citing United States v. Jones, 16 F.3d 487, 493 (2d Cir. 1994)). But here there is no reason to believe that there was any probability – let alone an "overwhelming probability" – that the jurors at Steele's trial would be unable to follow the instruction given, or that they would have to perform "mental acrobatics" in order to follow it. While Steele cites a New York case, People v. DeJesus, 137 A.D.2d 761 (2d Dep't 1988), in which the Appellate Division overturned a rape conviction where the prosecutor had made numerous inappropriate comments during her summation, see Def. App. Br. at 45, the prosecutor's comments in that case were substantially more inflammatory and prejudicial than those here.[4]

While the evidence of Steele's guilt rested almost exclusively on the testimony of T.C., the prosecutorial misconduct was not severe and was fully and forcefully cured by the trial judge's instructions. Given these circumstances, we believe that the comments ultimately had no

---

[4]For example, the prosecutor in DeJesus told the jury, "The greatest injustice done in this case is for you to acquit that man because he chose to rape someone he knew. If that's what you do, then you're licensing people in this community to go out and rape people they know." See DeJesus, 137 A.D.2d at 762. She then improperly referred to the jurors' families as possible victims of rape, and said, "if any one of your children or wives were raped by someone, you would not expect a jury to [acquit]." She also singled out two female members of the jury by name and asked them, "does a woman have a right to say on that day to a man that she knew, that she didn't want to have sex with him?" See id. The prosecutor also implied in her summation that the defendant had previously committed rape by referring to the fact that the victim had no injuries, and then stating, "Well what do you expect him to do? Grab somebody on the street, pull her into an alleyway with a knife? That's not the way this guy rapes." See id. The Appellate Division found that in spite of the trial court's curative instructions to the jury in that case, "the cumulative effect of all the errors requires reversal of the conviction and a new trial, particularly in light of the less than overwhelming evidence of the defendant's guilt." See id. at 762-63.

effect on the certainty of the conviction absent the improper conduct, see Bentley, 41 F.3d at 824. Thus, it was not an "unreasonable application" of Supreme Court law for the Appellate Division to so conclude.

## 2. Appeal to Sympathy

Steele also contends that the prosecutor improperly appealed to the jurors' sympathy by asking them to imagine themselves in T.C.'s shoes as she went through the ordeal of a rape exam and had to "withstand a risk of injustice because of a defense-imposed obligation to be consistent in every recounting of the incident." See Def. App. Br. at 44; Petition at 11; T. 561-63. The respondent counters that any such comments were "properly responsive to defense counsel's summation which repeatedly warned the jury that any variation in the statements made by T.C. about the rape meant that she could not be believed at trial." See Resp. Mem. at 16. Respondent adds that the use of the word "you" in describing the incident from T.C.'s perspective "was merely a rhetorical device to encourage the jurors to consider for themselves what a sixteen-year-old rape victim would be thinking about [] when making statements to the police on the night of the rape, and thus to focus them on what the prosecutor argued were the implications of petitioner's argument." See id.

While the court's curative instruction during the summation (T. 563-65) did not specifically address the issue of sympathy, the jury charge did:

> I think at one point an argument was made to put yourself in the shoes of somebody, [T.C.] or someone else or some future person. When we say decide a case without sympathy, we're telling you specifically don't do that.
>     Everybody who comes into this courtroom has feelings. Every witness you heard has feelings . . . . If we wanted them to be the jury we'd let them be the jury. They're not the jury. The reason you're the jury is because instead of deciding this case based on their feelings and emotions and sympathy, you as – in

19

a cold, hard, rational, logical way look at the facts without sympathy, without feelings for one side or the other, but just say to me – don't tell me who you care about or don't care about, but tell me what was proven, what wasn't. Let's use common sense that way. That's why you're the jury, not the witnesses. So I'm going to ask you to please reject both of those arguments when I tell you that you should decide this case without fear, favor or sympathy.

(T. 601-02). This instruction constituted a clear reminder to the jury that they should not place themselves in T.C.'s shoes, and that they should decide the case "without . . . sympathy," but rather by engaging in a "cold, hard, rational, logical . . . look at the facts." See T. 602.

As was true for the comments regarding the "lying woman defense," the misconduct reflected in the prosecutor's comments was not severe and it was forcefully cured. Notably, these comments came in response to Steele's own strong attack on T.C.'s credibility. See, e.g., Moore v. Warden, Southport Correctional Facility, 380 F. Supp. 2d 321, 331 (S.D.N.Y. 2005) ("Where a prosecution comment is a rejoinder to defense counsel's comments, that factor ameliorates the effect of an objectionable prosecution comment upon the fairness of a trial.") (citing United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir. 1989); United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981)); see also People v. Rodriguez, 159 A.D.2d 356, 357 (1st Dep't 1990) ("the prosecutor was not appealing to juror sympathy by suggesting that the jury put themselves in complainant's shoes" where "[c]onsidering defense counsel's attack upon the credibility of complainant, the prosecutor's suggestion properly permitted the jury to consider whether complainant's actions were reasonable and plausible under the circumstances").

Moreover, the comment was brief in comparison with the entire summation. See Bentley, 41 F.3d at 825. Again, given these circumstances, it cannot be said that the misconduct had an effect on the certainty of the conviction absent the improper conduct, see Bentley, 41 F.3d at

824, and it thus was not an "unreasonable application" of Supreme Court law for the Appellate Division to so conclude.

### 3. Shifting the Burden

Finally, Steele contends that the prosecutor impermissibly shifted the burden of proof onto the defense by stating that "[t]he fact that the defendant . . . forcibly engaged in sexual intercourse with [T.C.] is uncontradicted." See Def. App. Br. at 46; Petition at 9. Steele cites to a New York case noting that where a defendant is manifestly the only person who could contradict a complainant's version of events, such a statement is a violation of a defendant's "right not to testify without having a presumption created against him because of his failure to do so." See People v. Gould, 25 A.D.2d 160, 162 (1st Dep't 1966) (cited in Def. App. Br. at 47). The court in Gould overturned the defendant's conviction because of this and multiple other errors at trial, though it noted that "it may very well be that in the circumstances of this case, any of the errors referred to, standing alone, would not warrant reversal." See id.

Here, the prosecutor followed up the "uncontradicted" reference by stating, "The defendant doesn't have a burden in this case. I have the burden, but in his argument he attempted to contradict the testimony of [T.C.]. Her testimony is uncontradicted." (T. 586). During the jury charge, the trial judge explained at length the presumption of innocence and the burden of proof to the jury. (T. 612-14). In particular, he stated that because Steele was "presumed innocent, that means the People have the burden of proving the defendant guilty of each element, of each charged crime, and they also have the burden of disproving any defense he may have raised beyond a reasonable doubt." (T. 613). He added later that the "burden of guilt beyond a reasonable doubt . . . remains on the People throughout the trial and never shifts to the

defendant. As such, that means that the defendant, Mr. Steele, was under no obligation to present evidence or to testify." (T. 613). This was a reiteration of similar comments the trial judge made prior to the opening arguments in the case. See, e.g., V. 474 ("Because [Steele] is presumed innocent, that means the People have the burden of proving the defendant guilty of a charged crime and the burden of proving his identi[t]y as the person who committed the crime beyond a reasonable doubt. That means that Mr. Steele is not required to prove that he is not guilty. The burden is on the People and it never shifts.").

Taken together, the court's instructions to the jury both before and at the end of the trial were sufficient to counteract any question that might have been raised in the jury's mind regarding burdens of proof based on the prosecutor's brief comment that T.C.'s testimony was "uncontradicted." General jury instructions may cure prosecutorial misconduct, even if the instructions do not specifically address the erroneous remarks. See generally Garofolo v. Coomb, 804 F.2d 201, 206 & n.3 (2d Cir. 1986) (jury instructions relating generally to attorney summations cured specifically improper prosecutorial remarks); Lebron v. Girdich, 2003 WL 22888809, at *3 (S.D.N.Y. Dec. 5, 2003) (prosecutor's statement relating to burden of proof and petitioner's decision not to take the stand were cured by the court's general jury instructions before deliberations); see also United States v. Mapp, 170 F.3d 328, 337-38 (2d Cir. 1999) (prosecutor's summation that arguably "impermissibly suggest[ed] . . . that [defendant] has any burden of proof" not reversible error because any prejudice was eliminated by court's instructions). Furthermore, the "severity of the prosecutor's misconduct" may be "mitigated by the brevity and fleeting nature of the improper comments." See Tankleff, 135 F.3d at 253.

Here, the clear instructions regarding burden of proof and the presumption of innocence

were sufficient to cure any possible misunderstanding engendered by the prosecutor's use of the word "uncontradicted." Because this reference did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process," Darden, 477 U.S. at 181, habeas relief is unavailable. It follows that the Appellate Division's conclusion that the trial court's instructions and charge "effectively eliminated any possible prejudice to defendant," see Steele, 12 A.D.3d at 323 (citations omitted), was not contrary to or an unreasonable application of clearly established federal law.

Conclusion

Steele's petition is denied. Because he has not made a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

SO ORDERED.

Dated: July 19, 2006
New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Londel Steele
00-A-1489
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

Michelle Maerov
Assistant Attorney General
120 Broadway
New York, New York 10271

were sufficient to cure any possible misunderstanding engendered by the prosecutor's use of the word "uncontradicted." Because this reference did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process," Darden, 477 U.S. at 181, habeas relief is unavailable. It follows that the Appellate Division's conclusion that the trial court's instructions and charge "effectively eliminated any possible prejudice to defendant," see Steele, 12 A.D.3d at 323 (citations omitted), was not contrary to or an unreasonable application of clearly established federal law.

## Conclusion

Steele's petition is denied. Because he has not made a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

SO ORDERED.

Dated: July 19, 2006
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Londel Steele
00-A-1489
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

Michelle Maerov
Assistant Attorney General
120 Broadway
New York, New York 10271

23